RODNEY LOGAL, Plaintiff-Appellant, v. INLAND STEEL INDUSTRIES, INC., *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—89—3449

Opinion filed January 22, 1991.

Cindy K. Lail, of St. John, Indiana, for appellant.

Grippo & Elden, of Chicago (Philip C. Stahl and George R. Dougherty, of counsel), for appellees.

JUSTICE BUCKLEY delivered the opinion of the court:

Rodney Logal (plaintiff) appeals from an order of the circuit court of Cook County which granted Inland Steel Industries, Inc. (Industries), and Inland Steel Company's (Company's) motion to dismiss plaintiff's second-amended petition for a writ of *mandamus* compelling the inspection of certain corporate records pursuant to section 7.75 of the Illinois Business Corporation Act of 1983 (Ill. Rev. Stat. 1987, ch. 32, par. 7.75). Plaintiff contends that the circuit court erred in dismissing his petition. For the reasons that follow, we affirm.

Plaintiff's petition alleges that on May 3, 1989, plaintiff made written request upon the chairman and chief executive officer of Industries to inspect certain corporate records of Industries and Company. Subsequent demands were made on May 16, 1989, and June 1, 1989. The petition alleges that these demands were denied.

The petition further alleges that plaintiff is and has been for the past 30 years an employee of Company and a Company stockholder from 1958 until 1986. The petition states that at the 1986 annual meeting, Company's shareholders approved a corporate restructuring plan. Under this reorganization, Industries was created and now serves as a holding company for the stock of Company as well as for two other corporations. Upon reorganization, the petition alleges that plaintiff's stock holdings in Company became stock holdings in Industries and that, as of the petition's filing date, plaintiff owns 2,112 shares of Industries' common stock. Plaintiff no longer owns any stock in Company.

Plaintiff's petition asserts that in 1986, defendants closed the No. 3 Open Hearth Facility (the Facility) located in East Chicago, Indiana. According to the petition, the Facility was one of three basic types of steel-making furnaces that defendants employed to produce semi-finished steel from melted scrap metal. Relative to defendants' other furnaces, the petition reports that the Facility enabled defendants to

make the highest quality semi-finished steel more economically than that produced by defendants' other furnaces. Also, the Facility was the most efficient furnace of its type in the world and was equipped with modern and extensive pollution control devices.

In his petition, plaintiff claims that the decision to close the Facility was the product of fraud or gross mismanagement which has resulted in great losses of revenue for Company and derivative losses to Industries and its shareholders. Accordingly, plaintiff seeks to inspect defendants' books and records relating to the closing of the Facility in order to determine whether such fraud or gross mismanagement occurred, and if so, to institute shareholder derivative proceedings.

In support of his conclusion that the closing of the Facility was the result of fraud or gross mismanagement, plaintiff's petition states that after its closure, defendants began buying huge quantities of scrap steel which were then exported. The petition reports that this exported scrap metal would have been usable at defendants' facility but for its closure and that such material was not exported during the years the facility operated. In a July 31, 1989, letter from plaintiff to Industries' preferred shareholders, which the petition incorporates as an exhibit, plaintiff openly wonders "why Inland is exporting the same commodity that it is buying," and "how it can be more cost effective for Inland to purchase steel from outside companies instead of making the steel in its own open hearth."

The petition further states that the Facility produced 20% of defendants' steel in 1985 and that, immediately after its shutdown, defendants suffered steel shortages necessitating the "working down" of inventories and the purchase of huge tonnages of steel on the open market in 1986-1988. This decreased steel-making capacity attributable to the Facility's shutdown rendered defendants unable to take full advantage of the subsequently occurring increased profitability of the American steel industry. In addition, the petition states that despite the rebound of the United States' steel market's profitability and defendants' continuing steel shortages, the Facility was completely dismantled in 1988. In the same July 31, 1989, letter, plaintiff asserts that shutting and tearing down the Facility "was the wrong thing to do."

Finally, the petition, through the July 1989 letter, states that during this time, the Japanese-based Nippon Steel Corporation began to have a "major involvement at Inland." The letter describes how the Japanese performed internal studies of defendants' facilities and how the defendants were negotiating with the Japanese regarding the opening of a joint venture. Also, plaintiff wonders in the letter

whether the Japanese are getting the exported scrap and what price they are paying for it.

On November 16, 1989, the circuit court granted defendants' motion to dismiss plaintiff's petition. The court found that plaintiff's petition failed to allege sufficient facts to support his assertion that he was a "shareholder of record" of Company or had a "proper purpose" for the inspection. Plaintiff contends on appeal that his petition alleges sufficient facts to support both requirements. We disagree.

Plaintiff's petition to inspect corporate records is predicated on section 7.75(b) of the Illinois Business Corporation Act, which provides in part:

> "Any person who is a shareholder of record shall have the right to examine, in person or by agent, at any reasonable time or times, the corporation's books and records of account, minutes, voting trust agreements filed with the corporation and record of shareholders, and to make extracts therefrom, but only for a proper purpose." Ill. Rev. Stat. 1987, ch. 32, par. 7.75(b).

■ As the express terms of this section provide, shareholders have the right to examine their corporation's records if two important requirements are met. First, the examination must be for a proper purpose. (*Sawers v. American Phenolic Corp.* (1949), 404 Ill. 440, 447-49, 89 N.E.2d 374, 378-79; *Dogget v. North American Life Insurance Co.* (1947), 396 Ill. 354, 358-59, 71 N.E.2d 686, 688; *Morris v. The Broadview, Inc.* (1944), 385 Ill. 228, 232-34, 52 N.E.2d 769, 771.) Second, the party requesting an examination must be a shareholder of record of the corporation for which the records are sought. *South Side Bank v. T.S.B. Corp.* (1981), 94 Ill. App. 3d 1006, 1008-10, 419 N.E.2d 477, 478.

■ We first address the issue of whether plaintiff's petition alleges sufficient facts to show a proper purpose. As to this issue, the Illinois Supreme Court has elaborated on what constitutes a proper purpose:

> "A *bona fide* stockholder has a legal right of inspection when sought in good faith for a specific and honest purpose, not to gratify curiosity or for speculative or vexatious purposes, providing also the interest of such applicant is as a stockholder and is lawful in character and not contrary to the interest of the corporation." *Doggett*, 396 Ill. at 358-59, 71 N.E.2d at 688.

In *Sawers v. American Phenolic Corp.* (1949), 404 Ill. 440, 448-49, 89 N.E.2d 374, 378, the court once again stated that a proper purpose is one which seeks to protect the interests of the corporation as well

as the interest of the shareholder seeking the information. A shareholder has every right to examine corporate books and records to protect his interest so long as he has an honest motive and is not proceeding for vexatious or speculative reasons.

While we agree that a shareholder's good-faith request to inspect corporate books and records in order to reveal fraud or gross mismanagement may constitute a proper purpose in Illinois (see *Weigel v. O'Connor* (1978), 57 Ill. App. 3d 1017, 1025, 373 N.E.2d 421, 427), our review of plaintiff's petition leads us to conclude that it alleges no circumstances that justify plaintiff's assertion that the decision to close the facility amounted to fraud or gross mismanagement. The facts alleged by plaintiff—that (1) Company experienced steel-making capacity restraints after the facility was closed; (2) Company began buying steel from outside sources and then exporting it; (3) some of the exported steel was historically usable at the facility; (4) Company was unable to take full advantage of the market due to the facility's shutdown; and (5) the Japanese involvement with the defendants—do not support plaintiff's conclusion that the decision to close the facility was the result of fraud or gross mismanagement. They reveal nothing more than an employee-shareholder second-guessing a corporate decision made while functioning within a highly competitive, global industry.

In reviewing the sufficiency of the petition, we are mindful that a cause of action will not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will entitle plaintiff to recover. (*Fitzgerald v. Chicago Title & Trust Co.* (1978), 72 Ill. 2d 179, 187, 380 N.E.2d 790, 794.) We also recognize that all well-pleaded facts must be taken as true for judging the sufficiency of the complaint. (*Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.* (1986), 114 Ill. 2d 278, 288, 499 N.E.2d 1319, 1322.) However, we further note that conclusions of law or fact that are unsupported by allegations of specific facts upon which such conclusions rest need not be taken as true. (*Kirby v. Jarrett* (1989), 190 Ill. App. 3d 8, 545 N.E.2d 965.) We conclude that even after giving plaintiff's petition the required liberal construction (Ill. Rev. Stat. 1987, ch. 110, par. 2—603(c)), the petition's conclusion that fraud or gross management took place is not supported by the factual allegations plaintiff has set forth.

In reaching our conclusion, we do not intend to minimize the right of a shareholder to inspect corporate books and records. Nor do we intend to relay that plaintiff here is acting in bad faith. Our review of the petition, however, including the letters attached as ex-

hibits, demonstrates that plaintiff is seeking nothing more than to satisfy his curiosity as to recent events that he has witnessed or heard about as an employee. Satisfaction of curiosity does not constitute a proper purpose. *Sawyers*, 404 Ill. at 449, 89 N.E.2d at 379.

While this court could affirm the dismissal of plaintiff's petition solely upon our resolution of the first issue, we also consider the issue of whether plaintiff's petition alleges sufficient facts showing that plaintiff is a shareholder of record of Company. As to this issue, plaintiff concedes he is only a shareholder of record of Industries. However, plaintiff contends Company is a mere alter ego of Industries, and therefore, he is also a shareholder of record of Company.

In *South Side Bank v. T.S.B. Corp.* (1981), 94 Ill. App. 3d 1006, 1008-10, 419 N.E.2d 477, 478-80, the court addressed the issue of whether, under an earlier version of section 7.75 of the Act (Ill. Rev. Stat. 1983, ch. 32, par. 157.45), a parent corporation's shareholder has the right to examine the corporate records of the parent's subsidiary where the shareholder owns no stock in the subsidiary.

In resolving the issue before it, the court in *South Side Bank* noted that the issue was one of first impression in Illinois. Our research reveals it is the only Illinois case to date which has addressed the issue. After reviewing the cases from other jurisdictions on the issue, the court in *South Side Bank* concluded that no cause of action is stated where the petition contains no factual allegations that the subsidiary is the mere alter ego or instrumentality of its parent or that fraudulent transactions have taken place between the two corporations. In *South Side Bank*, because the plaintiff's petition totally lacked such allegations, the court affirmed the dismissal of the shareholder's petition to compel examination of the subsidiary's corporate records.

■ Generally, before a court will pierce a corporate veil, it must be shown that one corporation so controls the affairs of another that the other is the mere instrumentality or dummy of the former and that, under the circumstances, the observance of the fiction of separate corporate existences would sanction a fraud or promote injustice. (*Main Bank v. Baker* (1981), 86 Ill. 2d 188, 205, 427 N.E.2d 94, 101.) While Illinois courts act reluctantly when asked to pierce the corporate veil (*Sumner Realty Co. v. Willcott* (1986), 148 Ill. App. 3d 497, 501-02, 499 N.E.2d 554, 557), in determining whether piercing is proper, they have looked to the following factors: (1) inadequate capitalization; (2) failure to observe corporate formalities; (3) commingling of funds; (4) the absence of corporate records; and (5) the failure to maintain arm's length relationships among related entities. *Bankers*

*Trust Co. v. Chicago Title & Trust Co.* (1980), 89 Ill. App. 3d 1014, 1019, 412 N.E.2d 660, 664.

■ In this case, plaintiff's petition alleges seven factors to demonstrate that Company and Industries are mere instrumentalities of another: (1) Company's board of directors in 1985 were exactly the same persons as were on Industries' board of directors in 1986; (2) eight out of nine of Industries' officers in 1986 were officers of Company in 1985; (3) the president, chairman and chief executive officer of both Industries and Company in 1987 and 1988 were the same persons; (4) Industries and Company have their principal office in Chicago; (5) Industries issued stock certificates to plaintiff on Company's certificates by merely placing a stamp across old Company stock certificates that stated: "This certificate represents shares of common stock, $1.00 par value, of Inland Steel Industries, Inc."; (6) Industries issued stock under Company's employee stock purchase plan; and (7) Company and Industries use the same trademark.

Our review of the seven factors set forth above leads us to conclude that under *South Side Bank* and corporate veil-piercing principles, plaintiff's instrumentality or alter ego theory cannot be sustained. As to the first four factors, Illinois has long held that the separate corporate existence of two corporations may not be disregarded merely because one of the corporations owns the stock of the other, the two share officers, or occupy the same office space. (*Sumner Realty Co. v. Willcott* (1986), 148 Ill. App. 3d 497, 501-02, 499 N.E.2d 554, 557.) Indeed, these practices are common and exist in most parent-subsidiary relationships. (*Main Bank v. Baker* (1981), 86 Ill. 2d 188, 204-05, 427 N.E.2d 94, 101.) To hold otherwise would render virtually every subsidiary the alter ego of its parent.

Turning to the remaining factors, they do not justify the conclusion that Company and Industries are mere instrumentalities of another. The issuance of Industries' stock on old Company certificates does not dictate the conclusion that separate corporate existences were ignored. Rather, Industries' use of Company's stock certificates, instead of printing certificates anew, shows the observance of corporate formalities and the prevention of corporate waste. Similarly, as to the employee stock purchase plan, the exhibits in the record show that upon reorganization, Industries assumed all of the employee compensation and benefit plans of Company. As a result, it was totally proper for Industries to issue benefits under Company's old employee benefit plan. Finally, as to Industries' and Company's use of the same trademark, the conclusion that their funds are being commingled is not reached in light of the fact that many corporations use the trade-

marks of others under license agreements. The use of one company's trademark by another, without more, does not show that the two are instrumentalities of each other.

Apart from the insufficiency of the petition's allegations, the record reflects that Industries acts as a parent corporation for two other companies: Joseph T. Ryerson & Son, Inc., and J.M. Tull Metals Company, Inc. The record reflects that, prior to the reorganization, Ryerson had been a Company subsidiary for over 50 years and that Tull Metals was purchased by Industries in 1986 for $100 million. These facts further demonstrate that plaintiff's alter ego theory is not well founded.

Accordingly, we conclude that plaintiff's petition fails to allege sufficient facts to justify the assertion that Company and Industries are mere alter egos of another. Consequently, because plaintiff is not a "shareholder of record" of Company and has no "proper purpose," the order of the circuit court dismissing plaintiff's petition is affirmed.

Affirmed.

MANNING, P.J., and CAMPBELL, J., concur.