**REAL COLORS, INC.,
Plaintiff/Counter–
Defendant,**

v.

**JAYPRAKASH PATEL, Individually and d/b/a Jay Chem, and Prism International Incorporated, Defendants/Counter–Plaintiffs,**

v.

**Prashant Shah, Nirav Shah, and Rita Shah, Individually, Counter–Defendants.**

### No. 96 C 6098.

United States District Court, N.D. Illinois, Eastern Division.

March 17, 1999.

Paul R. O'Malley, Paul R. O'Malley, Ltd., Chicago, IL, for plaintiff.

Jerome H. Torshen, Robert James Slobig, Torshen, Spreyer & Garmisa, Ltd., Chicago, IL, for defendants.

Champ W. Davis, Jr., John Thomas Warlick, IV, Davis, Mannix & McGrath, Chicago, IL, for Prism Intern. Inc.

Beth A. Miller, Paul R. O'Malley, Ltd., Chicago, IL, for Prashant Shah counter–claimant.

1. In its Third Amended Complaint, Real Colors seeks relief only against Jay Chem and Jay Patel; neither count prays for relief against Prism.

    Therefore, Prism is hereby *dismissed* from the case. To the extent that Prism is referred

## MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

Before the Court are Defendants'/Counter–Plaintiffs' Motion for Summary Judgment against Plaintiff/Counter–Defendant and Defendants'/Counter–Plaintiffs' Motion for Summary Judgment against Plaintiff/Counter–Defendant and Counter–Defendants. For the reasons set forth below, the former Motion is granted, and the later Motion is granted in part, and denied in part.

## BACKGROUND

### I. Procedural Facts

This case concerns a supplier/"middleman" which alleges that it was wrongfully cut out of a deal by the manufacturer and its buyer. Plaintiff/Counter–Defendant, Real Colors, Inc. ("Real Colors"), is suing Defendants/Counter–Plaintiffs, Jayprakash Patel ("Jay Patel"), Jay Chem, and Prism International, Incorporated ("Prism")[1] (all Defendants/Counter–Plaintiffs, collectively "Jay Chem"), for breach of contract and tortious interference with Real Colors' contract with Isochem Colors, Inc. ("Isochem").[2] Pursuant to Federal Rule of Civil Procedure 13, Jay Chem has filed a Counterclaim against Real Colors and its owners, Prashant Shah, Rita Shah and Nirav Shah ("Prashant," "Rita," "Nirav," respectively, or collectively, "the Shahs") under the alter-ego theory of liability for breach of contract for Real Colors' alleged refusal to take delivery of, and pay for, goods shipped to it by Jay Chem.

On May 8, 1998, Real Colors filed both a motion to dismiss and a motion for summary judgment against Jay Chems' Amended Counterclaim. After careful review, this Court denied both motions on

to in this opinion, it is only to illustrate that it was a participant in the events that unfolded.

2. On July 25, 1997, the Court dismissed Isochem from this lawsuit due to a lack of personal jurisdiction.

July 27, 1998.[3] Consequently, and soon thereafter, Jay Chem filed two separate motions for summary judgment: one against Real Colors' Second Amended Complaint, brought against Jay Chem,[4] the other in support of Jay Chems' Amended Counterclaim as a Plaintiff against both Real Colors and the Shahs. Jay Chems' two motions for summary judgment are currently before the Court.

## II. *Substantive Facts*[5]

As stated earlier, this case involves a supplier/"middleman" which alleges that it was wrongfully cut out of a deal by the manufacturer and the buyer. Plaintiff/Counter–Defendant Real Colors, a supplier of salt-free dyes, is incorporated in Illinois. (Third Amended Complaint [3d Am.Compl.] at 1, ¶ 1.) Its shareholders and officers are Prashant Shah, his wife Rita Shah, and their nephew, Nirav Shah. (Defendants'/Counter–Plaintiffs' Rule 12(M) Statement of Material Facts as to Which There is No Genuine Issue in Support of their Motions for Summary Judgment [Defs.' 12(M) ] at 1, ¶ 1.)

The Shahs, the only officers and shareholders of Real Colors, founded the company in late 1994, in order to get into the dye business. (Defs.' 12(M) at 3, ¶ 1; Defs.'

12(M) at 2, ¶ 4.) Previously, Prashant's main business had been ownership and publication of the *India Tribune,* a newspaper widely circulated among Indian people in the United States. (Prashant Dep. at 12; Nirav Dep. at 17; Defs.' 12(M) at 3, ¶ 1.) Real Colors has no office of its own; consequently, it shares the office facilities of the *India Tribune.* (Prashant Dep. at 12; Nirav Dep. at 17.) Additionally, Real Colors has no property, plant, equipment or other assets. (Prashant Dep. at 12–13; Defs.' 12(M) at 3, ¶ 2.)

Defendant/Counter–Plaintiff Jay Chem, located in India, is a manufacturer and exporter of dyestuffs, including specialty dyes. (Defs.' 12(M) at 1–2, ¶ 2.) Jay Patel, the owner and operator of Jay Chem, is a citizen of India. (Defs.' 12(M) at 1, ¶ 2.)[6]

Initially, in December of 1994, Jay Patel contacted Jatin Shah (Nirav Shah's father) in India about meeting Real Colors' needs for supplying Reactive Yellow–37 dye. (Plaintiff/Counter–Defendant's Additional Statement of Facts Pursuant to Rule 12(N) in Response to Defendants'/Counter–Plaintiffs' Motions for Summary Judgment [Pl./Ctr.–Def.'s Adt'l Stmt.], ¶ 5; Nirav Dep. at 14.) Prashant

**3.** Despite failing to include a Statement of Undisputed Material Facts, as required by Local Rule 12(M), (which in and of itself provided sufficient grounds for denial), Real Colors' Motion for Summary Judgment was easily disposed of on its merits. Similarly, this Court denied Real Colors' motion to dismiss because Jay Chem sufficiently alleged facts to put Real Colors on notice as to what the counterclaims were and the grounds on which the claims rested.

**4.** Actually, subsequent to Jay Chems' two motions for summary judgment, Real Colors was granted leave to amend its Second Amended Complaint instanter on October 2, 1998. Real Colors filed its Third Amended Complaint on the same day. However, since the summary judgment motions were already being briefed, the Court stated that it would not require Jay Chem to file a responsive pleading (stating that the response could be addressed in Jay Chem's Reply Brief in support of its motion for summary judgment). Therefore,

this Court is really ruling on Jay Chems' Motion for Summary Judgment against Real Colors' *Third* Amended Complaint (as well as on Jay Chems' Motion for Summary Judgment for its Amended Counterclaim against Real Colors and the Shahs).

**5.** The following facts are taken from the parties' respective statements of material facts and accompanying exhibits submitted pursuant to Local Rules 12(M) and 12(N). Additionally, other background facts have been taken from various affidavits and exhibits from earlier motions. Pursuant to Federal Rule of Civil Procedure 56, the following facts are presented in the light most favorable to the non-moving party, Real Colors.

**6.** Prism, formerly a Defendant in this case, is run by Jay Patel's older brother, Naresh Patel. Prism's role is to expedite delivery of Jay Chem's products to U.S. customers and to collect payments. (Defs.' 12(M) at 5, ¶ 9.)

Shah, in January of 1995, met with Jay Patel in India regarding the establishment of a long-term business relationship to market and distribute Jay Chems' Yellow–37 dye. (Pl./Ctr.–Def.'s Adt'l Stmt., ¶ 5.) Real Colors needed a dye supplier and found one in Jay Chem. This was done because Real Colors had found a buyer for Yellow–37 dye: Isochem.[7] Jay Chem forwarded samples of its dye products, which the Shahs found acceptable in quality. (Defs.' 12(M) at 8, ¶ 17.) On February 6, 1995, Nirav, through Real Colors, forwarded the first purchase order to Jay Chem for Yellow–37 dye. (Defs.' 12(M) at 8, ¶ 17.) In response, Jay Chem shipped one ton of Yellow–37 dye directly to Isochem (Real Colors' buyer), for which Prism invoiced Real Colors for payment. (Id.) Accordingly, Real Colors, upon receipt of payment from Isochem, paid Jay Chem in full, through Prism, as agreed. (Defs.' 12(M) at 8, ¶ 17; Nirav Dep. at 30; Patel Dep. at 27.)

In March of 1995, Real Colors ordered another two tons of Yellow–37 dye, by purchase order no. 6662. (Defs.' 12(M) ¶ 18.) Again, Jay Chem shipped in accordance with the order, and Prism invoiced Real Colors. (Defs.' 12(M) at 8, ¶ 18; Patel Dep. at 34–35.) On this occasion, however, Real Colors paid only $33,000 of the $34,000 invoiced. (Defs.' 12(M) at 8, ¶ 18; Defs.' 12(M), Ex. 4; Patel Dep. at 34–35.) Real Colors asserts that Jay Patel had agreed to reduce the price of Yellow–37 dye to $16.50 per pound, which would apply to purchase order no. 6662, thus making the total bill $33,000. (Pl./Ctr.–Def.'s Adt'l Stmt., ¶ 6.)

In early April of 1995, Real Colors ordered another four tons of Yellow–37 dye, by its purchase order no. 6664 (Defs.'

12(M) at 9, ¶ 20; Defs.' 12(M) Ex. 7; Nirav Dep. at 37.) Real Colors received the goods roughly a month later and was billed $66,000 by Prism. (Id.) As required, Real Colors then remitted the payment to Prism, presumably after receiving payment from Isochem. (Defs.' 12(M) at 9, ¶ 20; Defs.' 12(M) Ex. 8; Nirav Dep. at 37–38.)

In late April of 1995, Real Colors issued purchase order nos. 6666, 6667, and 6668 for another four, two, and five tons, respectively, of Yellow–37 dye. (Defs.' 12(M) at 10, ¶ 24.) Jay Chem shipped the first two orders (purchase order nos. 6666 & 6667), and Prism invoiced Real Colors for $99,000. (Defs.' 12(M) at 10, ¶ 24; Defs.' 12(M), Ex. 11; Patel Dep. at 52–54.) Real Colors accepted both the four-ton and the two-ton shipments of Yellow–37 dye, but never paid the invoice. (Defs.' 12(M) at 10–11, ¶ 25; Nirav Dep. at 39–40, 53–54; Naresh Dep. at 64.)

While the payment for the six tons of Yellow–37 dye (purchase order nos. 6666 and 6667) was still pending, the Shahs met with Jay Patel on May 24, 1995, at the *India Tribune's* offices in Chicago to formalize an agreement. (Defs.' 12(M) at 9, ¶ 21; Prashant Dep. at 15.) Under this contract, Jay Chem agreed to manufacture and ship a substantial and steady supply of Yellow–37 dye to Real Colors. (Defs.' 12(M) at 9, ¶ 21; Nirav Dep. at 48.) During the course of the meeting, Real Colors agreed to purchase, and Jay Chem agreed to sell, another twenty-seven tons of Yellow–37 dye over a nine-month period. (Defs.' 12(M) at 9, ¶ 21; Patel Dep. at 38.) Jay Patel asked for, and Nirav provided, a letter setting forth the terms of the agreement as discussed at the May 24, 1995 meeting. (Defs.' 12(M) at 9–10, ¶ 22;

---

**7.** On or about March 7, 1995, Nirav Shah and Jeff Zavitkovsky, purchasing agent for Isochem, proposed entering into a one-year contract. (3d Am. Compl. at 2, ¶ 2; Ex. B.) The contract, which was negotiated in South Carolina, stipulated that Real Colors would supply Isochem with Reactive Yellow–37 dye for one year. (3d Am.Compl. at 2, ¶ 2.) Real

Colors asserts that this was to be an exclusive relationship, but Isochem stated that it never intended to buy Yellow–37 dye exclusively from Real Colors. (Nirav 9/28/98 Affidavit, ¶ 6; Defs.' 12(M) at 14, ¶ 38.) These facts simply illustrate that Real Colors was buying Yellow–37 dye from Jay Chem and selling it to Isochem.

Defs.' 12(M) Ex. 19; Nirav Dep. at 67–68.) This letter confirmed that Real Colors would purchase three tons of Yellow–37 dye per month. (Id.) Real Colors held this meeting, and committed Jay Chem to supply this quantity of Yellow–37 dye, because Isochem had advised Real Colors that it anticipated buying three tons of Yellow–37 dye per month. (Defs.' 12(M) at 10, ¶ 23.) On September 12, 1995, Jay Chem sent Real Colors a reminder that payment was overdue on Invoice No. 9510 (which included purchase order nos. 6666 and 6667). (Defs.' 12(M) at 11, ¶ 26; Defs.' 12(M) Exs. 11, 23; Nirav Dep. 80–81.)

However, by November of 1995, payment of the $99,000 for purchase order nos. 6666 & 6667 was still overdue. Real Colors still had made no payment for the six tons it had received during the summer of 1995. (Defs.' 12(M) at 13, ¶ 32; Defs.' 12(M) Ex. 30.) Therefore, on November 7, 1995 and November 21, 1995, Jay Chem again sent Real Colors reminders that payment was overdue on the two shipments of Yellow–37 dye. (Defs.' 12(M) at 11, ¶¶ 26–27; Defs.' 12(M) Exs. 30, 32; Nirav Dep. 119.) Additionally, despite issuing purchase order no. 6668 for the five-ton shipment of Yellow–37 dye in late April of 1995, Real Colors alleges that it timely cancelled delivery of the five-ton shipment.[8] (Pl./Ctr.–Def.'s Adt'l Stmt., ¶ 11; Nirav Dep. at 45–47.)

Prashant Shah acknowledged that Real Colors had delayed payment; he explained that it was due to a slowdown at its customer's (Isochem's) end.[9] Prashant further acknowledged that Jay Chem had manufactured and was holding an inventory of Yellow–37 dye, pursuant to Real Colors' prior orders. (Defs.' 12(M) at 13, ¶ 33.) Consequently, Prashant discussed the fact that Jay Chem could sell this material to other buyers, so that Jay Chem could avoid further losses. (Defs.' 12(M)

at 13, ¶ 33; Defs.' 12(M) Ex. 21.) Prashant assured Jay Chem that payment for the dye ordered in April of 1995 would be forthcoming, and he further told Jay Chem and Prism that he had applied for a loan to cover Real Colors' obligation to Jay Chem in the event Isochem did not pay Real Colors for the already-shipped dye. (Defs.' 12(M) at 13–14, ¶ 34; Prashant Dep. at 29–30; Naresh Dep. at 60–61.) However, Prashant merely discussed the possibility of a loan and never secured one. (Defs.' 12(M) at 13–14, ¶ 34; Prashant Dep. at 29–30.)

While Real Colors was waiting for Isochem to pay it for the $99,000 worth of dye (which would enable Real Colors to then pay Jay Chem/Prism), Prism contacted Isochem (in November of 1995), and offered to supply Reactive Yellow–37 dye to Isochem at a price lower than Real Colors'. (Pl./Ctr.–Def.'s Adt'l Stmt., ¶ 17.) When Nirav Shah informed Jay Patel that Isochem was Real Colors' client, Jay Patel told Isochem to disregard the lower price offer. (Pl./Ctr.–Def.'s 12(N) Ex. 23.) After this exchange, Isochem purchased a total of three more tons of dye from Real Colors. (Pl./Ctr.–Def.'s Adt'l Stmt., ¶ 21.) Eventually, however, in March of 1996, Jay Chem began to sell Yellow–37 dye directly to Isochem. (Id.; Defs.' 12(M) at 15, ¶ 41; Patel Dep. at 71.)

### III. Summary Judgment Standard

#### A. Federal Rule of Civil Procedure 56(c)

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper when the pleading and supplemental material present "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In a motion for summary judgment, the

---

**8.** This particular shipment is not at issue before the Court.

**9.** Isochem did not pay for the dye, and had the dye stored in its warehouse in South Carolina, until it could pay. This is the reason that Real Colors could not pay Jay Chem.

initial burden is on the moving party to identify "those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting FED.R.CIV.P. 56(c)). Summary judgment is then appropriate, unless these is sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The summary judgment standard requires more than a mere "scintilla of evidence," *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir.1994), to "defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. "A fact is material only if it might affect the outcome of the case under the governing law." *Anweiler v. American Elec. Power Serv. Corp.,* 3 F.3d 986, 990 (7th Cir.1993); *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 ("If the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." (citations omitted). Furthermore, in deciding a motion for summary judgment, the Court usually must view all facts and inferences in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 254–55, 106 S.Ct. 2505; *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 596 (7th Cir.1995), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1042, 134 L.Ed.2d 189 (1996).

## B. Local Rule 12(M) & 12(N) for United States District Court for the Northern District of Illinois

Apart from abiding by Federal Rule of Civil Procedure 56, the movant must also proceed pursuant to the Local Rules for the United States District Court for the Northern District of Illinois. Many district courts have adopted local rules in order "to streamline the resolution of summary judgment motions." *Waldridge v.*

*American Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir.1994). Local Rule 12 for the Northern District of Illinois is such a rule. Under Rule 12(M), the moving party must submit a statement of material facts, in the form of short numbered paragraphs, which contends no genuine issue/dispute exists. The movant's statements must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth ...." Local Rule 12(M)(3).

Similarly, Local Rule 12(N) places a corresponding requirement on the non-moving party, who must file a concise response to each paragraph in the movant's 12(M) statement including, in the case of any disagreement, specific references to supporting materials. *See Dade v. Sherwin–Williams Co.,* 128 F.3d 1135, 1139 (7th Cir.1997) (citing Local Rules 12(M) and 12(N)). If the non-movant fails to specifically refute any material facts set forth in the movant's 12(M) statement, these facts will be deemed admitted. Local Rule 12(N)(3)(b); *Dade,* 128 F.3d at 1139; *see also Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994). Rule 12(N) also authorizes the non-moving party to submit a statement of additional facts requiring denial of summary judgment. This statement, like the movant's, must take the form of short, numbered paragraphs supported by specific references to the record. *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1313 (7th Cir.1995). A 12(N) statement containing only flat denials and irrelevant facts, without referring to supporting materials, may be disregarded.

## DISCUSSION

### I. *Local Rule 12(M) & 12(N) Analysis*

The initial issue before this Court is whether to treat the facts asserted in Jay Chem's 12(M) statement as admitted for the purposes of Jay Chems' two current motions. As discussed earlier, prior to the two summary judgment motions at bar,

Real Colors filed a Motion for Summary Judgment against Jay Chems' Amended Counterclaim. However, Real Colors never filed a 12(M) statement, as required by Local Rule 12. Jay Chem, on the other hand, filed a 12(N) statement, as required of a non-moving party by Local Rule 12. Although warned numerous times by the Court[10] and opposing counsel[11] regarding the severe implications of not following the Local Rules, Real Colors still did not attempt to properly reply to Jay Chems' 12(N) response to Real Colors' motion for summary judgment. Notwithstanding Real Colors' failure to properly follow local procedure, the Court denied its motion for summary judgment on the *merits*.

For the purposes of the current motions, Jay Chem has properly set forth its 12(M) statement. Additionally, and not surprisingly, the facts set forth in Jay Chem's current 12(M) are the same as those set forth in Jay Chem's Rule 12(N) Statement (filed in response to Real Colors' Motion for Summary Judgment). Jay Chem now argues that, since Real Colors failed to properly file a 12(M) (and a reply to Jay Chem's 12(N) in its motion for summary judgment), the Court could have deemed those 12(N) facts admitted. Further, since Real Colors did not properly reply (and because the Court *could* have deemed the facts from the previous summary judgment motion as admitted but did not, choosing instead to rule on the merits), Jay Chem argues that the Court should now deem those facts admitted for the purposes of Jay Chems' current summary judgment motions. (Defendants' Memorandum of Law in Support of Motion for Summary Judgment [Defs.' Mem.Supp.], p. 1 n. 1.)

Although Real Colors acknowledges that it failed to properly follow Local Rule 12 with respect to its earlier, denied, motion for summary judgment, it asserts that it properly filed the 12(N) here, against Jay Chem's two pending motions for summary judgment. Real Colors argues that the facts allegedly "admitted" during its prior summary judgment motion should not be deemed admitted for the purposes of Jay Chem's current motions. Real Colors states that, Jay Chem is improperly seeking to use statements that might have been deemed admitted on an earlier motion by transferring them to a wholly different motion. This, Real Colors contends, would obviously result in it being denied an opportunity to contest the facts contained in Jay Chem's current 12(M). (Plaintiff/Counter–Defendants' Motion For Leave to File Supplement to Memorandum of Law In Response to Defendants' Motions for Summary Judgment or in the Alternative to Supplement Reply Brief in Support of Plaintiff/Counter–Defendants' Motion For Summary Judgment, 3–4.)

■ Local Rule 12 is not a secret. Moreover, the Local Rule is clearly written, and frequently discussed in case law. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994). It was even the subject of a fairly recent article in the Chicago Bar Association's "CBA Record." *See* Lain D. Johnston, *Summary Judgment Motions in the Northern District, the Importance of Local Rules 12M & 12N*, CBA RECORD, Apr. 1998, at 24–29. The purpose of the Local Rule is threefold: (1) To aid in the administration of justice and contribute to the "orderly conduct of litigation," *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989); (2) to "isolat[e] and dispos[e] of factually unsupported claims and defenses," *Davis v. Frapolly*, 756 F.Supp. 1065, 1069–70 (N.D.Ill.1991) as well as to "smok[e] out

---

**10.** For example, Real Colors was warned on June 15, 1998 during a status hearing before the Court.

**11.** Counter–Plaintiffs' Combined Response to the Shahs' Motion for Summary Judgment

and Motion to Dismiss, filed on June 24, 1998, also contained a footnote placing Real Colors on notice that it had failed to follow the Local Rules.

the existence or nonexistence of genuine issues of material fact." *Buergin v. MMI Cos., Inc.*, No. 95 C 528, 1995 WL 758106, at *1 (N.D.Ill.Dec.21, 1995), *supplemented by* 1995 WL 769346, at *1 (N.D.Ill.Dec.29, 1995); and, finally, (3) to simplify the court's task of determining a summary judgment motion. *Schroeder v. University of Illinois at Chicago*, No. 96 C 6020, 1997 WL 587699, at *1 (N.D.Ill. Sept.18, 1997).

■ The district court is entitled to enforce strictly or leniently the local summary judgment rules. *Harper v. City of Chicago Heights*, 824 F.Supp. 786, 791 (N.D.Ill.1993). The case law is extremely clear that, if the non-moving party fails to file a 12(N) statement, the district court will assume that the non-moving party has admitted the moving party's version of the facts, and the court will not continue to construe the facts in favor of the non-moving party, as required by Federal Rule of Civil Procedure 56. *See Waldridge*, 24 F.3d at 921; *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir.1995). However, in the case at bar, the non-moving party, Real Colors, has timely filed its 12(N) in response to the moving party, Jay Chem's, 12(M).[12] Simply put, Jay Chem is attempting to apply the facts asserted in its previous 12(N) (which *could* have been deemed admitted during Real Colors' Motion for Summary Judgment but were *not*) and hoping that the Court will now deem them admitted for purposes

of the current motions. Jay Chem is trying for a procedural victory by barring Real Colors from responding at all.

Despite the creative 12(M) usage advanced by Jay Chem, this Court is unwilling to make such a Jordanesque leap. *See generally In re Martin*, 142 B.R. 260, 263 (Bankr.N.D.Ill.1992) ("Failure to file a response to the statement of facts is deemed an admission of all reasonable facts set forth in the movant's statement and waives, *for purposes of the motion*, the adverse party's opportunity to contest the facts in the statement.") (emphasis added). Additionally, considering the abovementioned three functions of Local Rules 12(M) and 12(N), it would be unfair not to consider the facts in Real Colors' timely filed 12(N) Statement. Otherwise, if the Court deemed Jay Chem's 12(M) as admitted, Real Colors would be effectively prohibited from responding at all. Obviously, Real Colors, for the purposes of its earlier motion for summary judgment, failed to appreciate the importance of Local Rule compliance. Although it might have been fatal to that motion, it is not necessarily fatal for subsequent motions. This Court will consider Real Colors' 12(N) in opposition to Jay Chem's 12(M).

## II. *Defendants' Motion For Summary Judgment Against Plaintiff's Second–Amended Complaint*

Real Colors' Third Amended Complaint[13] contains two separate allegations:

---

**12.** There were several deficiencies in Real Colors' 12(N). Specifically, it did not include the entire transcripts to the depositions cited in its 12(N). Additionally, Real Colors inadvertently failed to respond to a category (instead it responded to the sub-parts of the category) contained in Jay Chem's 12(M) Statement of Facts. However, this Court, on October 14, 1998, allowed Real Colors to amend these deficiencies in order to properly contest Jay Chem's two Motions for Summary Judgment.

**13.** The Complaint at issue here is actually the Third Amended Complaint, not the Second Amended Complaint. As referred to earlier in this Opinion, subsequent to Jay Chems' filing

of the two Motions for Summary Judgment, Real Colors filed a Motion for Leave to Amend its Second Amended Complaint. The Court granted Real Colors' Motion, and Real Colors filed its Third Amended Complaint. Therefore, the current motion for summary judgment is now against Real Colors' *Third* Amended Complaint. There are three major differences between Real Colors' Second and Third Amended Complaints. First, the Third Amended Complaint drops the breach of contract and tortious interference claims against Isochem. This amendment is necessary, considering the fact that Isochem has been dismissed from the current suit. Second, the Third Amended Complaint drops the civil conspiracy claim against Defendants. Third,

one for breach of contract between Real Colors and Jay Chem, the other for tortious interference with Real Colors' contract with Isochem.

## A. Real Colors' Breach of Contract Allegation

█ Real Colors alleges that Jay Chem breached their contract on November 7, 1995, when Prism (Jay Chem's agent) faxed a price listing of dyes to Isochem, despite knowing that Isochem was already Real Colors' customer. (Plaintiff/Counter-Defendants' Memorandum of Law in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment [Pl./Ctr.-Def.'s Mem.Supp.], at 7.) Real Colors has alleged numerous times that Jay Chem specifically agreed to sell Yellow-37 dye exclusively to it. (3d Am.Compl., ¶ 6.) In effect, this is the crucial issue in Real Colors' breach of contract claim against Jay Chem. If there was no apparent "exclusivity" agreement—either written or oral—Jay Chem could not possibly have breached the contract with Real Colors.

First, Prashant Shah, as a representative of Real Colors, testified in his deposition on November 6, 1997, that there was no agreement for exclusive dealing:

Q. .... You mentioned that in this meeting at Jay Chem's office in India, that you said that you would like to have an exclusive for this particular item. What was the particular item?

A. Yellow—reactive yellow 37, hundred eighty percent strength.

\* \* \*

Q. Did Jay Patel say anything about the exclusive proposition?

A. He was not, you know, willing to do this thing.

and most important, Real Colors is now alleging that Jay Chem was bound to exclusive dealing terms with Real Colors, whether it liked it or not, and whether Jay Chem knew it or not, because exclusive contractual dealing is a "trade usage" in the dye importing business. (3d Am.Compl. at 3, ¶ 6.) In essence,

(Prashant Dep. at 13.) Second, regarding the May 24, 1995 contract, Nirav Shah claimed that Jay Patel agreed that it would be exclusive, but he was unable to say, in his deposition, how Jay Chem manifested such an agreement:

Q. All right. Focusing specifically on the May 24, 1995, discussion among yourself, Prashant, and Jay of the exclusive dealing proposal, who said what to whom?

A. We said that we want the exclusive with him as far as reactive yellow 37 is concerned, that they market the yellow 37 through us in the United States.

Q. Exactly what did Jay Patel say to you?

A. And he agreed to it.

Q. What were his words?

A. I don't remember.

(Nirav Dep. at 63–64.) Additionally, this exclusive dealing requirement was not memorialized in writing. Specifically, following the May 25, 1995 meeting, Real Colors sent a written confirmation of all the important terms to which Real Colors and Jay Chem had agreed on May 24, 1995: "Q. Did you include in this letter [Defs.' 12(M) Ex. 19] all of the important terms to which you had agreed on May 24, 1995? A. Yes." (Nirav Dep. at 67.) Nowhere in the aforementioned letter was there reference to an agreement for Jay Chem to sell Yellow–37 dye *exclusively* to Real Colors.

In support of its allegation that Jay Chem agreed to sell Yellow–37 dye exclusively to it, Real Colors (in the Third Amended Complaint) asserts that Jay Chem is bound to exclusive dealing terms because exclusive dealing is a "trade usage" in the dye importing business. (3d

this introduced an entirely new theory into the Complaint. Since this theory was inserted after Jay Chems' Motions for Summary Judgment had been filed, the Court allowed Jay Chem to respond to this new Complaint in its Reply brief.

Am.Compl., ¶ 6.) Additionally, Real Colors includes two affidavits from other dye merchants, each stating that there is an "unwritten rule" of exclusive dealing in the industry. (Mafat Patel Affidavit, ¶ 2; David Picha Affidavit, ¶ 2.)

The Seventh Circuit has spoken clearly on the issue of "trade usage." Specifically, in *Dahly Tool Co. v. Vermont Tap and Die Co.*, 742 F.2d 311, 314 (7th Cir.1984), the Seventh Circuit held that "[t]o be binding ... a trade custom or usage must be so well known, uniform, long-established, and generally acquiesced in so as to induce the belief that the parties contracted with reference to it, nothing in their contract to the contrary." Similarly, *Allen Saltzman Assocs., Inc. v. Aileen, Inc.*, 633 F.Supp. 1161, 1163 (N.D.Ill.1986), *clarified by* No. 94 C 1741, 1986 WL 5738, at *4 (N.D.Ill. May 14, 1986), held that the proponent of a trade usage claim "must have several witnesses ... able to show that the usage was generally known in the trade, and overall have such weight of the evidence on his side 'to warrant a presumption that all contracts in the line of business to which the custom applies are made with reference to it.'" (quoting *Gord Indus. Plastics v. Aubrey Manuf. Inc.*, 127 Ill.App.3d 589, 82 Ill.Dec. 855, 469 N.E.2d 389, 392 (1984). The *Aileen* court further added that, where the plaintiff fails to show that all, or virtually all, similar contracts in the trade are made with reference to the asserted custom, summary judgment is appropriate to the defendant. *Id.* at 1164. Accordingly, the court granted summary judgment despite plaintiff's argument that the trade usage was a question of fact. *Id.*

Applying these standards of "trade usage," the Court finds that Real Colors has failed to produce enough evidence to suggest that dye-supply contracts are customarily exclusive. As in *Aileen*, the evidence before this Court fails to support the argument for a trade usage. First, although Real Colors claims that all of its agreements are exclusive, the Shahs and Real Colors were aware (and still entered

into the agreement) that Jay Chem was unwilling to enter into an exclusive agreement. (Prashant Dep. at 13.) Second, despite Real Colors' assertion that it is customary in the dye business to enter into exclusive agreements, the evidence shows that at least four companies (Jay Chem, Prism, Real Colors, and Isochem) do not abide by this practice. Similarly, the affidavits of Real Colors' colleagues in the dye trade, Mafat Patel and David Picha, do not suggest otherwise. In fact, the affidavits merely show what the two companies say about their own dealings with Real Colors, and nothing about standard industry procedure. The affidavits state nothing regarding their other dealings, or the dealings of others in the industry. The evidence before this Court does not rise to the necessary level outlined in *Aileen* and *Dahly*; specifically, that the Plaintiff must "show that all, or nearly all, contracts in his trade are made with reference [to the asserted custom]." *Aileen*, 633 F.Supp. at 1163.

"[T]he court's responsibility in summary adjudication is to determine if a genuine issue of material fact exists, and in so doing it may consider the burden of proof a plaintiff would face at trial." *Aileen*, 633 F.Supp. at 1163. As stated earlier, Real Colors' burden at trial would be to establish that all, or nearly all, contracts in this industry were exclusive. Consequently, as discussed above, Jay Chem has demonstrated that Real Colors could not meet its burden of establishing a "trade usage" theory for breach of contract. The Court believes that this judgment adequately disposes of the breach of contract claim raised in Count I of Real Colors' Third Amended Complaint. Accordingly, Jay Chem's Motion for Summary Judgment as to Real Colors' claim for breach of contract is granted.

**B. Real Colors' Tortious Interference with Contract Claim**

■ The second allegation of the Third Amended Complaint is that Jay Chem tor-

tiously interfered with Real Colors' contract with Isochem. (3d Am.Compl., Count II.) In order to prevail on a tortious interference with a contract claim, Real Colors must show:

> (1) the existence of a valid and enforceable contract between plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other caused by the defendant's wrongful conduct; and (5) damages.

*Philip I. Mappa Interests, Ltd. v. Kendle,* 196 Ill.App.3d 703, 143 Ill.Dec. 936, 554 N.E.2d 1008, 1011 (1990).

### 1. *Existence of a Valid and Enforceable Contract Element*

Jay Chem argues that, although Real Colors executed an agreement with Isochem, under Real Colors' definition of a contract, Real Colors failed to establish the crucial terms of the agreement, i.e., that Isochem agreed to buy Yellow–37 dye solely from Real Colors. (Defs.' Mem.Supp., at 7–8.) Real Colors, contrary to its earlier definition of dye contracts, argues that, regardless of whether or not the contract was for an "exclusive dealing arrangement," the contract was valid and enforceable. (Pl./Ctr.–Defs. Mem.Supp., at 5.) The fact that both Isochem and Real Colors intended to enter into contractual relations is sufficient evidence to suggest that there was a valid and enforceable contract between Real Colors and Isochem. Therefore, the evidence suggests that a valid and enforceable contract existed between Real Colors and Isochem.

### 2. *Defendants' Awareness of Contract Element*

Jay Chem asserts that Real Colors has come forward with no evidence demonstrating Jay Chem's or Prism's awareness of Real Colors' contract with Isochem. (Defs.' Mem.Supp., at 8.)

Real Colors, on the other hand, asserts that Jay Chem and Prism were aware of the contractual relationship between it and Isochem. (Pl./Ctr.–Def.'s Mem.Supp., at 5.) According to Prashant Shah, Jay Chem was aware of the contractual relations between Real Colors and Isochem, no later than October or November of 1995, which was right around the time that Naynesh Danak (from Prism) faxed to Isochem dye price quotes. (Prashant Dep. at 48–50.) Further, Prashant spoke to Naynesh Danak and informed him that Isochem was Real Colors' buyer and Prashant requested that Prism and Jay Chem not enter any agreements with Isochem. (Nirav Dep. at 93–94.) Additionally, a November 9, 1995 fax from Jay Patel to Isochem illustrates that Jay Chem was aware of Real Colors' contract with Isochem; Patel notified Isochem to disregard Prism's quoted dye prices and to continue the sales dialogue with Real Colors. (Pl./Ctr.–Def.'s 12(N), Ex. 23.) Therefore, the overwhelming evidence suggests that Jay Chem was aware of Real Colors' contractual relationship with Isochem.

### 3. *Defendants' Intentional and Unjustified Inducement of Breach of Contract and Subsequent Breach by the Other Caused By the Defendant's Wrongful Conduct Elements*

■ Simply put, Real Colors argues that the November 7, 1995 fax from Naynesh Danak of Prism to Isochem Colors, including price quotes which substantially undercut Real Colors' prices, was an intentional and unjustified inducement of breach of the contract between Real Colors and Isochem. (Pl./Ctr.–Def.'s Mem. Supp., at 6; Pl./Ctr.–Def.'s 12(N), Ex. 15.) Real Colors brings to light a letter sent from Jay Patel to Isochem explaining that Real Colors was Jay Chem's agent in the Mid–West United States. (Pl./Ctr.–Def.'s Mem.Supp., at 6; Pl./Ctr.–Def.'s 12(N), Ex. 23.) Real Colors argues that this evidence is sufficient to raise a fact issue before this Court.

However, as Jay Chem correctly points out, the evidence before this Court flatly contradicts the proposition that either Jay Chem or Prism *intentionally* induced Isochem to breach its contract with Real Colors. Although Jay Chem faxed Isochem a price list of various dyes, Jay Patel asked Isochem to disregard the prices, as they were sent unintentionally and by mistake. (Pl./Ctr.–Def.'s 12(N), Ex. 23.)

Furthermore, Jeff Zavitkovsky, purchasing agent for Isochem, stated under oath that Jay Chem did not convince it to breach its contract with Real Colors. (Zavitkovsky Dep. at 7.) Jeff Zavitkovsky's deposition testimony establishes that the real reason Isochem stopped dealing with Real Colors was that he found that Nirav of Real Colors had lied to him, and Isochem wanted no part of a supplier who was dishonest:

Q. And why did you decide to [purchase dye from Jay Chem directly] when you knew there were at least seven more tons sitting in a warehouse down the road from here?

A. Because when I received a phone call from Jay Patel and I found out that Nirav Shah had lied to me about his relation with Jay Chem. He lied to me, what I mean by that was he told me that his father owned the company. And then when I mentioned it, when I brought that fact up to Jay he said, he is not my son, he is not even related to me. And also the fact in December of '95 we had placed some orders with him on two other products—.

Q. With who? I'm sorry, tell me who you placed an order with?

A. With Real Colors, with Nirav Shah. And he told me he cannot fill the orders because his father wanted me, or Isochem Colors to open up a letter of credit. We did not do so, therefore the order cancelled. And I ·felt like he lied to me about that and he lied to me about his relationship with Jay Chem, as far as that his father owned the company.

(Jeff Zavitkovsky Dep. at 7–8.)

Real Colors attacks Jeff Zavitkovsky's testimony on the grounds that it is unreliable and biased because he was advised that Isochem could still be sued in federal court in South Carolina on the same theories. (Pl./Ctr.–Def.'s Mem.Supp., at 7.) Despite Real Colors' theory that Jeff Zavitkovsky's testimony is unreliable, Real Colors has failed to produce any evidence supporting its allegation that Jay Chem intentionally induced Isochem to breach its contract with Real Colors.[14] Therefore, this Court holds that Real Colors has failed to create a genuine issue of material fact as to whether Jay Chem intentionally and unjustifiably induced Isochem to breach its contract with Real Colors. Since Real Colors failed to meet its burden on the third element for the breach of contract allegation, it also failed to create a genuine issue of material fact that the subsequent breach was caused by Jay Chem's wrongful conduct.

### 4. *Damages Element*

Having failed to create a genuine issue of material fact regarding the third and fourth elements for tortious interference with a contract, this Court need not address the fifth (and final) element—damages. Therefore, Jay Chem's Motion for Summary Judgment, against Real Colors' claim for tortious interference with a contract, is granted.

### III. Counter–Plaintiffs' Motion for Summary Judgment in Support of Its Amended Counterclaim Against Counter–Defendants

Jay Chem has also filed a Motion for Summary Judgment in support of its

---

**14.** Additionally, Real Colors' assertion about the incredibility of Jeff Zavitkovsky is misplaced since, on a motion for summary judgment, the Court does not decide credibility issues; rather, the Court discerns whether genuine issues of material fact exist.

Amended Counterclaim against Real Colors and the Shahs, individually. Initially, Jay Chem alleges that Real Colors breached its contract by not paying Jay Chem $100,000 for several shipments of Yellow–37 dye that was delivered to and accepted by Real Colors. (Counter–Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment [Ctr.–Pls.' Mem.Supp.], at 2.) Jay Chem also asserts that it is entitled to "pierce the corporate veil" of Real Colors, and therefore, that the Shahs are individually liable for damages incurred by Jay Chem. (Ctr.–Pls.' Mem.Supp., at 3.)

### A. Jay Chem's Breach of Contract Claim

It is uncontroverted that Real Colors and Jay Chem entered into an agreement whereby Jay Chem sold quantities of Yellow–37 dye to Real Colors. (Defs.' 12(M) at 9, ¶ 21.) The specific issues before the Court today deal with two separate shipments. Specifically, Real Colors first issued purchase orders nos. 6666 and 6667 for 4 and 2 tons, respectively, of Yellow–37 dye. Jay Chem shipped each order, and Prism invoiced Real Colors for $99,000.[15]

#### 1. *Purchase Order Nos. 6666 and 6667 for $99,000*

■ Jay Chem alleges that Real Colors owes $99,000 for the delivery of six tons of Yellow–37 dye (the 2–ton and 4–ton shipments). In response, Real Colors states that Jay Chem prevented Real Colors from performing its obligations under the contract by interfering with the contract between Real Colors and Isochem, which in turn resulted in the failure of Real Colors to make payment on the $99,000. (Plaintiff/Counter–Defendant's Memorandum in Support of Plaintiff/Counter–Defendant's Response to Counter–Plaintiff's Motion for Partial Summary Judgment [Pl. /Ctr.–Def.'s Mem.Supp.Resp.], at 2.)

In Illinois, when a buyer accepts goods, the seller is entitled to recover the contract price. *Olcese v. Mobile Fruit & Trading Co.,* 211 Ill. 539, 71 N.E. 1084, 1087 (1904); 810 ILCS 5/2–709 (U.C.C. § 2–709) (West 1993). The uncontested facts show that Real Colors accepted the dye and, to date, has failed to pay for it. In fact, Jay Chem has attempted numerous times to collect payment of the $99,-000. On September 12, 1995, November 7, 1995, and November 21, 1995, Jay Chem sent Real Colors reminders that payment was overdue on Invoice No. 9510 (which included purchase order nos. 6666 & 6667). (Defs.' 12(M) at 11, ¶¶ 26–27; Nirav Dep. at 80–81.)

Real Colors, in response, argues that Jay Chem improperly breached their contract by contracting/dealing with Isochem. (Pl./Ctr.–Def.'s Mem.Supp.Resp., at 2–3.) Real Colors argues that this breach resulted in Jay Chem's breach of the contract with Real Colors. Real Colors asserts that Jay Chem's and Prism's actions effectively prevented Real Colors from performing its obligations under the contract with Jay Chem (to pay Jay Chem). Therefore, Real Colors argues that it is not liable for the $99,000, since Jay Chem's interference was the cause for Isochem's breach (and thus the cause for Real Color's non-payment to Jay Chem). (Pl./Ctr.–Def.'s Mem.Supp.Resp., at 2–3.) Even if this Court, *arguendo,* found that there was a genuine issue of material fact with respect to that particular claim (which it does not, for the reasons explained in Section II of this Opinion), the alleged "interference" took place on November 6, 1995, months after Real Colors accepted delivery of the six tons of Yellow–37 dye. (Pl./ Ctr.–Def.'s Mem.Supp.Resp., at 2 .) Therefore, this Court finds that Jay Chem is entitled to summary judgment for the unpaid invoices totaling $99,000.

**15.** Additionally, Jay Chem alleges that Real Colors underpaid Prism's invoice for a March 1995 two-ton shipment by $1,000. Thus, the total requested (for underpaid shipments) by Jay Chem is $100,000. (Defs.' 12(M) at 8–9, ¶¶ 18–19.)

Additionally, Jay Chem seeks prejudgment interest on the amount past due. According to the Interest Act, a movant is entitled to interest accrued at 5% per annum where the delay of payment is vexatious and unreasonable. 815 ILCS 205/2. Considering the fact that Real Colors never contested the quality of the goods, Jay Chems' frequent attempts to collect overdue payments on the $99,000, and Real Colors' complete disregard of this argument, the Court grants summary judgment for $99,000, plus 5% interest per year [16] ($14,850 interest from July 31, 1995 to today). Therefore, Jay Chem's Motion for Summary Judgment is granted in the amount of $113,850 for Real Colors' breach of contract with respect to purchase order nos. 6666 and 6667.

### 2. *Jay Chem's Remaining Claim for $1000*

■ Real Colors ordered two tons of Yellow–37 dye in March of 1995 by its purchase order no. 6662. (Defs.' 12(M) at 8, ¶ 18.) Accordingly, Jay Chem shipped the two tons, and Prism invoiced Real Colors. Payment was made; however Real Colors remitted only $33,000 against the $34,000 invoice. (Defs.' 12(M) at 8, ¶ 18; Defs.' 12(M), Ex. 4.) According to Nirav Shah, Jay Patel orally agreed to reduce the price of Reactive Yellow–37 to $16.50 per pound from $17.00 per pound; he agreed that the reduction would also apply to the two ton order from purchase order no. 6662.

Q. Real Colors remitted payment of $33,000 in respect of this Invoice [No. 6662] to Prism; true?

A. Yes.

Q. Why did Real Colors remit an amount $1,000 less than the amount on the purchase price and invoice?

A. As this order was placed, Prashant was in India. And he negotiated a contract with Jay Chem.... They negotiated a price of $16.50 per kilo, and Prashant told them this price will also be applicable to the order we just placed. And Jay Chem did agree to that price. So instead of seventeen, it was sixteen.

(Nirav Dep. at 34.) While there is no factual dispute as to the $99,000 owed Jay Chem, the scant evidence available regarding the remaining $1,000 does indicate a triable issue. Viewing the facts most favorable to the non-moving party, Nirav Shah's deposition testimony illustrates that a genuine issue of material fact does exist with respect to the remaining $1,000. Therefore, Jay Chem's Motion for Summary Judgment regarding the disputed $1,000 for invoice no. 6662 is denied.[17]

### B. Jay Chem's Alter–Ego Claim of Liability Against the Shahs

Jay Chem alleges that the Shahs have disregarded the separate corporate identity of Real Colors and misused the corporate form solely to pursue their personal ends, mainly, evasion of their contractual obligations to Jay Chem. (Counter–Plaintiffs' Mem.Supp., at 3.) Therefore, they are seeking to pierce the corporate veil and impose personal liability on the Shahs.

The Seventh Circuit follows Illinois law on the issue of piercing the corporate veil. "It is a well-established principle that a corporation is separate and distinct as a legal entity from its shareholders, directors and officers and, generally, from other corporations with which it may be affiliated." *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 56 Ill.Dec. 14, 427 N.E.2d 94, 101 (1981).

Courts are usually reluctant to pierce the corporate veil. In determining wheth-

---

**16.** This figure is rounded off and, therefore, covers three years.

**17.** Although Jay Chem's Motion for Summary Judgment regarding the $1,000 allegedly owed for invoice no. 6662 is denied, this Court questions whether the parties wish to go to trial over this sole remaining issue.

er to pierce the corporate veil, the court looks for evidence of two prerequisite conditions: "[f]irst, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist; and, second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388–89 (7th Cir.1994); *Pederson v. Paragon Pool Enters.*, 214 Ill.App.3d 815, 158 Ill.Dec. 371, 574 N.E.2d 165, 167 (1991).

### 1. *Unity of Interest and Ownership*

■ In determining whether unity of interest and ownership exists, a court should consider the following variables, with no single factor being determinative: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) non-payment of dividends; (5) insolvency of the debtor corporation at the time; (6) non-functioning of other officers or directors; (7) absence of corporate records; and (8) whether the corporation is a mere facade for the operation of dominant stockholders. *Ted Harrison Oil Co. v. Dokka*, 247 Ill. App.3d 791, 187 Ill.Dec. 441, 617 N.E.2d 898, 902 (1993).

■ In the present case, the Court does not find sufficient evidence of unity of interest and ownership to satisfy this prerequisite for piercing the corporate veil. First, the evidence does not support Jay Chems' assertion that Real Colors was undercapitalized. The core of the undercapitalization inquiry is whether the defendant intended to circumvent the rights of creditors. *Pederson*, 158 Ill.Dec. 371, 574 N.E.2d at 169. Although capitalization at the time of incorporation is the standard measure, courts will also consider whether parties infuse cash into the company during the course of regular business. *See, e.g., In re Wallen*, 262 Ill.App.3d 61, 199

Ill.Dec. 359, 633 N.E.2d 1350, 1359 (1994) (finding no evidence of undercapitalization because regular infusions of cash belied argument that party sought to avoid the claims of his creditors). The facts of this case clearly illustrate that Real Colors, after being paid by Isochem, paid Jay Chem for the Yellow–37 dye. Payment deadlines were developed that allowed Real Colors to buy dye from Jay Chem, make delivery to Isochem, receive payment from Isochem, and then appropriately pay Jay Chem. Prior to the current dispute, Real Colors promptly remitted payments to Jay Chem for dyes delivered to Isochem. Therefore, the evidence does not suggest undercapitalization by Real Colors.

Second, the evidence clearly indicates that Real Colors did issue stock to its three shareholder as follows: Rita Shah— 70%, Prashant Shah—15%, Nirav Shah— 15%. (Pl./Ctr.–Def.'s Adt'l. Stmt., ¶ 2; Pl./ Ctr.–Def.'s 12(N), Ex. 17.) Although there exists conflicting deposition testimony regarding the allocation of ownership among the three shareholders, the corporate records contained in Real Colors' Response to Jay Chem's Motion for Summary Judgment demonstrate a sufficient allocation of stock.

Third, the evidence before this Court suggests that Real Colors did observe corporate formalities. Real Colors filed Annual Reports in 1996 and 1997. (Pl./Ctr.– Def.'s 12(N), Ex. 17.) Similarly, the affidavit of Ira Kaufman, Real Colors' accountant, states that Real Colors has properly filed tax returns and annual reports. (Pl./ Ctr.–Def.'s 12(N), Ex. 18.) Kaufman's affidavit testimony further states that Real Colors and *India Tribune* keep separate financial records, and have separate expenses, checking accounts, corporate tax returns, and payroll tax returns. (Pl./ Ctr.–Def.'s 12(N), Ex. 18.) Additionally, Real Colors, by and through its three shareholders, regularly held corporate meetings, kept meeting minutes, and followed the corporate requirements under

Illinois law. (Pl./Ctr.–Def.'s 12(N), Exs. 1, 17).[18]

Fourth, Jay Chem alleges that Real Colors has brought forward no evidence that it has paid dividends to its shareholders. However, with respect to a motion for summary judgment, the Court is obligated to view the facts in a light most favorable to the non-movant. The bald assertion that Real Colors failed to bring forward sufficient evidence of dividend payments does not necessarily mean that dividends were not distributed to the three shareholders.

Fifth, the evidence suggests that Real Colors faces insolvency because of this ordeal. Jay Chem alleges that, as a result of the Shahs' actions, Real Colors faces insolvency. (Defs.' 12(M) at 14, ¶ 36.) Real Colors responds in its 12(N) statement that Real Colors faces insolvency because of Jay Chems' actions. (Pl./Ctr.–Def.'s 12(N) ¶ 36.) Real Colors, however, does not support its 12(N) statement with reference to the factual record, as required by Local Rule 12(N). Accordingly, the Court finds that Real Colors does face insolvency.

Sixth, Jay Chem alleges that there exists a non-functioning of corporate officers at Real Colors. Specifically, Jay Chem states that Rita Shah, one of Real Colors' presidents, does not appear to have any role in the business. (Ctr.–Pls.' Mem. Supp., at 6.) Additionally, Jay Chem asserts that there is conflicting information with respect to the duties which the three shareholders—Prashant, Rita, and Nirav—are assigned. (Ctr.–Pls.' Mem.Supp., at 6.) Real Colors, again, simply states that its officers were regularly functioning officers without any supporting information. (Pl./Ctr.–Def.'s Mem.Supp., at 4.) However-

er, the current record is replete with references to Prashant and Nirav as functioning members of Real Colors. Although their duties may have overlapped, the evidence illustrates that they both took an active role in generating and maintaining business with Jay Chem, Prism and Isochem. The fact that Rita rarely, if ever, takes part in the day-to-day business of Real Colors is insufficient to support this element.

Seventh, as discussed earlier, Real Colors has kept formal corporate records, including meeting minutes and annual reports.

Eighth, this Court concludes, after a complete review of the record, that the corporation was not a mere facade for the operation of the dominant stockholders.

As the analysis illustrates, there is insufficient evidence, viewed in the light most favorable to the non-movant, to allow this Court to pierce Real Colors' corporate veil. Accordingly, this Court does not find that Jay Chems' allegations illustrate the necessary unity of interest and ownership in Real Colors to hold the Shahs personally liable.

### 2. *Sanction Fraud or Promote Injustice*

Assuming, *arguendo*, that Jay Chem was able to show unity of interest and ownership, Jay Chem must also allege facts sufficient to establish that adherence to the fiction of separate identities would "sanction a fraud or promote injustice." *Hystro*, 18 F.3d at 1390. According to *Sea–Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 524 (7th Cir.1991), "courts that properly have pierced corporate veils to avoid 'promoting injustice' have found

---

**18.** Jay Chem claims that Real Colors' corporate records which were produced in their Response Brief should not be considered by this Court because they were not produced pursuant to a December 15, 1997 discovery request. Real Colors did not respond to the discovery request because, at the time, it objected on the basis that it had nothing to do with pending issues facing Real Colors. In addition, this issue was apparently discussed among opposing counsel in March of 1997; however Jay Chem never brought a motion pursuant to Rule 37(a) to compel disclosure or for sanctions. Therefore, this Court will consider Real Colors' corporate records in its alter-ego analysis.

that unless [they] did so, some 'wrong' beyond a creditor's inability to collect would result. . . ." That is "[s]ome element of unfairness, something akin to fraud or deception . . . must be present in order to disregard the corporate fiction." *Pederson*, 158 Ill.Dec. 371, 574 N.E.2d at 169. Similarly, Illinois courts have pierced corporate veils to avoid injustice when failure to do so would unjustly enrich one of the parties. *B. Kreisman & Co. v. First Arlington Nat'l Bank of Arlington Heights*, 91 Ill.App.3d 847, 47 Ill.Dec. 757, 415 N.E.2d 1070, 1073 (1980)

Here, the evidence indicates that Real Colors and the Shahs were willing to pay Jay Chem's bill—and wanted to continue dealing with Jay Chem; however, Real Colors never received payment from Isochem, and therefore, has been unable to pay Jay Chem. Prior to this event, Real Colors had repeatedly paid their invoices. Further, Real Colors is not being unjustly enriched, as Jay Chem alleges, because, in effect, Real Colors has not been enriched whatsoever. Real Colors has not received a dime from Isochem or anyone else with respect to the disputed shipments. Therefore, Jay Chem has not shown that the Shahs would satisfy the second element required for personal liability. Accordingly, Jay Chems' Motion for Summary Judgment that the Shahs are individually liable for Real Colors' debts to Jay Chem is denied.

### CONCLUSION

For the foregoing reasons, Jay Chem is entitled to summary judgment as a matter of law with respect to Counts I and II of Real Colors' Third Amended Complaint. Additionally, Count I of Jay Chems' Motion for Summary Judgment in support of its Amended Counterclaim against Real Colors is granted, in part, for the amount of $113,850. *See supra* n. 16. Jay Chems' Motion for Summary Judgment regarding Count II of its Amended Counterclaim is, hereby, denied. The only remaining issue is whether Jay Chem is entitled to pay-ment of an additional $1,000 for the alleged shortage with regard to purchase order no. 6662.

**IT IS THEREFORE ORDERED** that:

Partial Summary Judgment be, and the same hereby is, **GRANTED,** in favor of Jay Chem and against Real Colors, in the amount of $113,850.